Tucker, Richard T., J.
Pursuant to G.L.c. 231 A, plaintiffs seek a declaratoiy judgment determining the coverage obligations of the defendant insurers for judgments they may ultimately obtain in tort actions pending against defendants’ insured.[4] As a result of this action’s procedural history,[5] the disputed issues have been whittled down to a question of contract interpretation. The insurers, Scottsdale Insurance Co. (“Scottsdale”) and Utica Mutual Insurance Co. (“Utica”), have declined to indemnify their insured based on an exclusionary clause contained in the insurance policies. The plaintiffs argue that their claims do not fall within the scope of the provision. The court agrees. However, only the Utica policy actually provided coverage to the insured during the relevant period. Accordingly, the plaintiffs’ Motion for Summary Judgment with respect to Utica is ALLOWED, and Utica’s Motion for Summary Judgment is DENIED. Conversely, the plaintiffs’ Motion for Summary Judgment with respect to Scottsdale is DENIED, *16 and Scottsdale’s Motion for Summary Judgment is ALLOWED.[6]
BACKGROUND
The parties agree that there are no material facts in dispute. Having reviewed the record, the court summarizes its findings below.
Kahr Arms, Inc. (“Kahr Arms”)[7] is a weapons manufacturer doing business in Worcester, Massachusetts and specializing in the production of lightweight handguns. Kahr Arms is a subsidiary of Saielo, Inc. (“Saielo”), a Delaware corporation. In March 1999, the company hired Mark Cronin to work in its manufacturing facility despite his extensive criminal history, which included arrests for violent and drug-related crimes. Over the course of the next several months, Cronin systematically stole unserialized handgun components, assembled them himself outside the Kahr Arms facilities, and then sold or traded the completed handguns on the local black market. One of these handguns eventually found its way into the possession of drug dealer Edwin Novas. On December 24, 1999, Novas fired multiple rounds from the 9mm weapon during a violent altercation in Worcester, severely injuring Armando Maisonet and killing Danny Nicacio.
Juana Hernandez, Nicacio’s mother, brought a wrongful death action against Kahr Arms, Saielo, and their affiliates in August 2002. Maisonet followed with a separate personal injury action a month later. Both plaintiffs advanced similar claims premised on the contentions that Kahr Arms negligently allowed the gun to enter the stream of commerce, and that the negligence proximately caused Maisonet’s injuries and Nicacio’s death.[8] Kahr Arms sought coverage for indemnity and defense from its insurance companies, Scottsdale and Utica,' but they rejected the claims. Thereafter, the plaintiffs’ attorneys sent demand letters pursuant to G.L.c. 93A to Scottsdale and Utica, seeking $1 million from each insurer for each plaintiff.[9] Scottsdale and Utica rebuffed these demands, as well, maintaining the position that their insurance policies specifically excluded coverage for liabilities arising out of the shooting.
In all relevant respects, Scottsdale and Utica furnished comprehensive general liability insurance for Kahr Arms under nearly identical policies.[10] Scottsdale insured Kahr Arms from Januaiy 12, 1998, until the parties amended the named insured on the policy and removed Kahr Arms, effective September 2, 1999. In the meantime, Utica issued a one-year policy to Kahr Arms beginning on July 15, 1999. Essentially, one policy was a continuation of the other. Both policies contained signed endorsements excluding coverage for liabilities falling under a boilerplate “products-completed operations hazard” provision. The “products-completed operations hazard” is defined as follows:
a. Includes all bodily injury and property damage occurring away from your premises you own or rent and arising out of your product or your work except:
(1) Products that are still in your physical possession; or
(2) Work that has not been completed or abandoned . . .
“Your product” means:
a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed by:
(1) You; . . .
The insurance companies contend that the exclusion applies in this case because Maisonet and Nicacio were shot with a Kahr Arms weapon while away from Kahr Arms’s facilities. Therefore, according to their arguments, the bodily injuries arose out of their insured’s product, bringing them within the scope of the products-completed operations hazard.
In addition to relying on the products-completed operations hazard exclusion, Scottsdale argues that it has no obligation to indemnify Kahr Arms because Kahr Arms was not a named insured on its policy when Maisonet and Nicacio were shot. In July 1999, Saielo spun off the machine shop portion of Kahr Arms and incorporated it as a separate entity called SMI-MA, Inc. (“SMI”). The new company produced customized parts for treadmills, computers, and other items. As mentioned previously, an endorsement was added to the Scottsdale policy at that time that indicated a change in the name insured from “Saielo, Inc. d/b/a Kahr and d/b/a Saielo Manufacturing Industries” to “SMI MA, Inc.,” effective September 2, 1999. A new Worcester location had also been included in the policy coverage, and SMI’s principal place of business was registered at that address.
DISCUSSION
I. STANDARD OF REVIEW
Summaiy judgment shall be granted where there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Mass.R.Civ.P. 56(c); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of triable issues. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). If the moving party establishes the absence of a triable issue, either by submitting affirmative evidence negating an essential element of the non-moving party’s claim, or by demonstrating that the non-moving party’s evidence is insufficient to establish its claim, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Kourovacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). In so doing, the non-moving party may not rely merely on the allegations and denials of its pleadings, but must set forth specific facts with affidavits, deposition testimony, answers to interrogatories, or admissions *17 on file showing that there is a genuine issue for trial. Mass.RCiv.P. 56(e); LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
Issues concerning the interpretation of an insurance contract are generally questions of law. Cody v. Connecticut General Life Ins. Co., 387 Mass. 142, 146 (1982). Once faced with such questions of law, the court’s interpretation of the policy is governed by common-law rules of contract construction. Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). If unambiguous, a contract’s meaning is appropriate for a judge to decide on summary judgment. Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002).
II. THE PRODUCTS-COMPLETED OPERATIONS HAZARD EXCLUSION
The provisions at the heart of the dispute in this case are not uncommon, and their meanings as they apply to insured firearms manufacturers has previously been the subject of judicial scrutiny. See Taurus Holdings v. U.S. Fidelity, 913 So.2d 528 (Fla. 2005); Mass. Bay Ins. Co. v. Bushmaster Firearms, Inc., 324 F.Sup.2d 110 (D.Me. 2004); Beretta U.S.A. Corp. v. Fed. Ins. Co., 17 Fed.Appx. 250 (4th Cir. 2001) (unpublished); Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1 (1st Cir. 2000). In each of these cases, the reviewing court found that the products-completed operations hazard exclusion operated to deny coverage for the firearms manufacturer who had been sued in tort for injuries “arising out of” the weapon he had produced and sold. Naturally, Scottsdale and Utica rely on this line of cases for their argument that the term “arising out of your product” is unambiguous and should be interpreted broadly to include all bodily injuries resulting from the discharge of any Kahr Arms guns.
The court does not question the reasoning in the precedents cited by the insurance companies. However, by arguing that the provision applies in these circumstances, Scottsdale and Utica would have the court extend the exclusion too far. The theory of recovery and the facts as alleged in the underlying tort claims in this case distinguish it from the Brazas line of cases. Here, the injuries alleged do not fall within the scope of the products-completed operations hazard exclusion.
The plaintiffs in the aforementioned gun-related litigation all brought essentially the same claim. In Taurus and Beretta, municipalities and classes of individuals asserted claims for “negligent marketing and distribution of guns and public nuisance.” Beretta, 17 Fed.Appx. at 252; see Taurus, 913 So.2d at 530. The cases in Bushmaster and Brazas were brought mainly by or on behalf of gunshot victims on the theory that the manufacturers had “negligently... flooded the firearms market,” and that the gun industry had “created a public nuisance.” Brazas, 220 F.3d at 3; Bushmaster, 324 F.Sup.2d at 111. The firearms manufacturers in these cases universally failed to secure coverage from their insurers for payments resulting from the plaintiffs’ claims. To briefly paraphrase the logic of the courts,[11] the products-completed operations hazard clause applied to the plaintiffs’ claims because two interdependent factors had caused the plaintiffs’ injuries. See Brazas, 220 F.3d at 8 (emphasis added). The first source of injury was the manufacturer’s alleged misconduct in negligently saturating the market with weapons. Id. The second source of injury was the firearms themselves. Id. Because both the manufacturers’ conduct and the plaintiffs’ claims “indisputably derived from firearms,” the products-completed operations hazard exclusion was triggered and the manufacturers were not entitled to indemnity coverage. Id. at 8-9.
By contrast, the plaintiffs’ claims in this case derive from Kahr Arms’s alleged negligent hiring, supervision, and security at its facilities, not the gun that ultimately caused their injuries. The plaintiffs have not contrived a legal theoiy designed to circumvent policy exclusions. The allegations of negligence in the complaint are substantial and based in fact. Prior to April 2000, Kahr Arms did not use inventory tracking records. Prompted by an investigations by the Federal Bureau of Alcohol, Tobacco and Firearms, Kahr Arms reported on April 8, 2000, that 41 handguns manufactured between 1995 and 1999 were missing from its inventory and unaccounted for. In addition to negligently tracking its inventory, a jury could find that Kahr Arms did not adequately screen, supervise or monitor its employees. The facilities were not equipped with security cameras, security guards, or metal detectors. At least two employees had admitted to stealing handgun components from Kahr Arms during the relevant time period, and Cronin testified that it was so “easy” to walk out of the facilities with parts that he did it “all the time.” If they are established at trial, these facts would call into question the standard of care Kahr Arms exercised while operating its facilities during the relevant time period, particularly in light of the strict regulations imposed on the gun manufacturing industry by the federal government. See, e.g., 18 U.S.C. §§922(d) (governing who may sell or dispose of firearms) and 923(g) (loss or theft reporting obligations); see also Hoffman v. Houghton Chem Corp., 434 Mass. 624, 639-40 (2001).
The facts supporting the plaintiffs’ claims and Massachusetts decisional law bears out the distinction between the instant case and the Brazos line of cases. In Worcester Mutual Ins. Co. v. Marnell, 398 Mass. 240, 246 (1986), the Supreme Judicial Court concluded that the motor vehicle exclusion in a policy of homeowner’s insurance did not operate to exclude coverage of a claim arising out of a drunk driving accident involving the insured’s car, where the underage driver had obtained alcohol and became intoxicated at the insured’s home. According to the Marnell Court, the plaintiffs theoiy of recovery, based on *18 negligent supervision, was “separate and distinct from the use or operation of an automobile.” Id. The same principles adhere to the allegations against Kahr Arms in this case. Unlike the plaintiffs in Brazas and its progeny, Maisonet and Nicacio can point to evidence of negligence of one specific manufacturer that is “separate and distinct” from the distribution and marketing of firearms by an industry as a whole. Moreover, no “completed” firearm product is at issue here; rather Maisonet and Nicacio argue that Kahr Arms’s negligence involves the permitted removal of individual component parts.[12] See Hakim v. Mass. Insurer’s Insolvency Fund, 424 Mass. 275, 280 (1997) (courts “must construe the words of the policy in their usual and ordinary sense”). Finally, the claims implicating Kahr Arms’s security practices sound in premises liability. The products-completed operations hazard exclusion on which the insurance companies rely, however, only applies to injuries occurring away from the premises.
In construing insurance policy language, one of the court’s primary goals is to give effect to what the policyholder reasonably should expect his coverage to be. Bond Bros., Inc. v. Robinson, 393 Mass. 546, 551 (1984); see W. Alliance Ins. Co. v. Gill, 426 Mass. 115, 117 (1997) (“[WJhen construing language in an insurance policy, [a court] considers what an objectively reasonable insured, reading the relevant policy language, would expect to be covered”), quoting Atl Mut. Ins. Co. v. McFadden, 413 Mass. 90, 92 (1992). Should the plaintiffs prevail on the merits at trial, Kahr Arms could reasonably anticipate protection from its general liability insurance providers for claims arising out of negligence taking place on its premises during the coverage period. Exclusions are to be strictly construed, and Scottsdale and Utica have not borne their burden of establishing the applicability of the products-completed operations hazard exclusion on the facts presented here. See Great Sw. Fire Ins. Co. v. Hercules Bldg. & Wrecking Co., 35 Mass.App.Ct. 298, 302 (1993).
III. SCOTTSDALE AND UTICA’S OBLIGATIONS UNDER THE OCCURRENCE-BASED POLICIES
The determination that the products-completed operations hazard exclusion would not bar Kahr Arms’s potential indemnity claims does not resolve the entire matter. Questions about the legal significance of the timing of the injuries remain. The plaintiffs have stated claims for negligence that span a period of approximately nine months, from March 1999 (when Kahr Arms hired Cronin) to December 1999 (when Maisonet and Nicacio were shot). It is undisputed that neither Scottsdale nor Utica insured Kahr Arms for that entire period. Scottsdale’s coverage terminated on September 2, 1999, while Utica’s coverage began on July 15, 1999. Hence, the two insurance companies’ coverage periods overlapped for approximately a month and a half.
The policy terms dictating coverage obligations are terms of art, whereby liability is caused by injury, and injury is caused by an occurrence. As is often the case with claims made on occurrence-based policies, the question whether liability is incurred during a policy period turns on the fact-intensive resolution of the underlying dispute by a jury. Nevertheless, it is the court’s responsibility to interpret the insurance policy in order to properly frame the fact-finder’s inquiry. See A.W. Chesteron Co. v. Massachusetts Insurers Insolvency Fund, 445 Mass. 502, 518 (2005). Massachusetts courts have found that negligent acts or omissions that lead to an injury may be the “cause” of an injury for the purposes of determining occurrence liability of an insurer. See RLI Ins. v. Simon’s Rock Early Coll., 54 Mass.App.Ct. 286, 291-92 (2002), and cases cited. However, in a case like this, where the alleged wrongdoing consisted of a pattern of conduct extending over a period of time, the causative acts and the injurious results of those acts are not necessarily the same “occurrence" that may give rise to liability. For instance, on these facts, a jury could determine that negligent acts in both policy periods contributed to the cause of Maisonet and Nicacio’s injuries. Yet, as the court will explain shortly, it would not be permissible for Kahr Arms to receive indemnification on multiple grounds, or from both insurers.
In Simon’s Rock Early College, a student went on a shooting spree that resulted in two deaths and injuries to four others. Simon’s Rock Early Coll., 54 Mass.App.Ct. at 287. There was evidence that the college and its employees acted negligently and could have prevented the tragedy. Id. at 295. One question before the court was whether the cause of the injuries was the shooting itself or the conduct of the college and its employees. Id. at 289. Based on Massachusetts decisional law and a definition of “occurrence” in that defendant insured’s policy that is substantially identical to the one at issue here, the court determined that “it is an insured’s actions or failures to act (here the alleged negligence) and not the deliberate acts of the wrongdoer that constitute the ‘cause’ of the victims’ injuries.” Id. at 292; see Worcester Ins. v. Fells Acres Day Sch., Inc., 408 Mass. 393, 407-11 (1990).
The Scottsdale and Utica policies defined occurrence as “an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Like in Simon’s Rock Early College, the language of the policies “contemplates the possibility that multiple acts taking place over a space of time may contribute to a single occurrence for the purposes of coverage.” Simon Rock’s Early Coll., 54 Mass App. Ct. at 294. There, the court held that,
[a]lthough several events have been described as leading to Lo’s shooting spree . . . , these facts do not describe separate occurrences, but rather constitute evidence of an arguably inadequate policy of security and student supervision that may have *19 contributed to Lo’s ultimate access to a murder weapon. It is this alleged failure or inadequacy of the college’s policy that forms the basis of the insureds’ liability here, and constitutes a single occurrence for insurance coverage purposes.
Id. at 295. The plaintiffs have not alleged particular acts of negligence that are “discrete” and “so separated by time and location” that they would give rise to multiple claims on the policies for multiple occurrences. Id. at 294; cf. Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, 61 (3rd Cir. 1982) ("The fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence”). Therefore, should the plaintiffs prevail in the underlying actions, Kahr Arms would be entitled to indemnification on the basis of only one occurrence and not every act of negligence alleged by the plaintiffs. Simon Rock’s Early Coll., 54 Mass.App.Ct. at 294-95.
If, as a matter of law, Kahr Arms’s inadequate hiring, supervision, and security practices constitute only one occurrence under the policies, then the court must reach the crucial issue of where that one occurrence could be assigned on the timeline of negligence. Because Scottsdale and Utica promised to insure Kahr Arms against “bodily injury . . . caused by an ‘occurrence’ that takes place ‘in the coverage territory,’ ” Kahr Arms would not be entitled to indemnification from an insurer who was not on the risk at the time of the occurrence. Scottsdale argues that it has no obligation to indemnify Kahr Arms because, unlike Utica, it stopped insuring Kahr Arms well before the December 24, 1999 shooting. Scottsdale’s position is correct, albeit for the wrong reasons.
An important factor in determining when an occurrence takes place for purposes of insurance coverage is the nature of injury. Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc., 407 Mass. 675, 687 (1990) (internal citations omitted). Courts have applied different “triggers of coverage” depending on the types of injuries or property damage. See, e.g., A.W. Chesterton Co., 445 Mass. at 523 (adopting the exposure theory trigger to asbestos-related claims); New Castle County v. Continental Casualty Co., 725 F.Sup. 800, 812 (D.Del. 1989) (applying continuous trigger to environmental damage from spread of leachate); American Home Prods. Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760, 764 (2d Cir. 1984) (adopting an injuiy-in-fact trigger in bodily injury case); Eagle-Picher Indus. v. Liberty Mut. Ins. Co., 523 F.Sup. 110, 118 (D.Mass. 1981) (relying on a manifestation theory trigger where plaintiffs suffered from a progressive disease). With respect to tort claims, the general rule is that the entity making the claim against the insured must sustain harm within the period of the policy in order to assert a claim to which the insurance applies. Honny’s Oil Serv., Inc. v. Insurance Co. of N. Am., 783 F.Sup. 1505, 1508 (D.Mass. 1992); see Continental Casualty Co. v. Gilbane Bldg. Co., 391 Mass. 143, 152 (1984). This principle is particularly apt when the plaintiff is the victim of a “latent” danger or harmful condition. See Eagle-Picher, 532 F.Sup. at 114 (“There can be no question but that the aspect of the occurrence which must take place within the policy period ... is the ‘result,’ that is, the time when the accident or injurious exposure produces personal injury”).
Scottsdale disclaimed an indemnification obligation to Kahr Arms partially because it mistakenly determined that the December 24,1999 shooting was the occurrence on which Kahr Arms’s claim was based. As the court has already concluded, proof of the plaintiffs’ allegations of negligence, and not proof of the shooting by itself, is necessary to establish an occurrence under the policy. Nevertheless, the plaintiffs obviously sustained their actual injuries at the time of the shooting. There is no other landmark of personal harm to which the plaintiffs can cite that preceded the moments when Maisonet and Nicacio were shot with the stolen Kahr Arms handgun. It is indisputable that the bodily injury caused by the alleged negligence was a discrete and isolated incident that took place in the early morning hours of December 24, 1999.
In this case, a jury could find that the occurrence comprised a host of negligent acts taking place over the course of nine months. Yet the appropriate trigger of coverage in these circumstances is the injury-in-fact theory, which implicates only the policy period during which injuries or damages can be proven. 23 E.M. Holmes, Appleman on Insurance §145.3(B)(2), at 15 (2d ed. 2003). Neither the underlying facts nor the relevant policy language would justify the application of any other trigger. A manifestation trigger assigns the occurrence to the date when a plaintiff discovered, or should have discovered, a preexisting, undetected injury. An exposure trigger, on the other hand, posits that the occurrence takes place when the plaintiff first encounters a lasting, injury-causing condition. And under a continuing loss theory, all policies on the risk from the date of initial exposure through manifestation are triggered if the plaintiff can prove the persistence of bodily injury throughout that period. Although Kahr Arms’s allegedly negligent hiring, supervision, and security practices could be considered a continuing harmful condition, none of these triggers are applicable because plaintiffs were not actually injured by those practices until Maisonet and Nicacio were shot.
Finally, the fact that Kahr Arms’s alleged wrongful conduct bridged both policy periods does not implicate the Scottsdale policy. Only specific policy language will trigger coverage based on the wrongful acts of the insured. See, e.g., Atlantic Mut. Ins. Co. v. J. Lamb, Inc., 100 Cal.App.4th 1017, 1032 (2002) (personal injury policy provision); City of Harrisburg v. International Surplus Lines Ins. Co., 596 F.Sup. 954, 959 (M.D.Pa. 1984) (policy designed to insure public officials); see also Rozenfeld v. Medical Protective Co., 73 F.3d 154, *20 156 (7th Cir. 1996) (recognizing that Wisconsin law rejects the general rule that “an ‘accident’ does not ‘occur,’ within the meaning of a policy of liability insurance, until the person claiming against the insured is injured”), citing Lund v. American Motorists Ins. Co., 797 F.2d 544 (7th Cir. 1986). Kahr Arms purchased standard comprehensive general liability insurance from Scottsdale. The court does not discern any provision in the policy or any endorsement that would suggest that Scottsdale and Kahr Arms intended to insure against not only the accidents resulting in injury, but also the causative negligent acts themselves. Rather, the policy’s application is plainly limited to liability for bodily injuries.
Applying the injuiy-in-fact trigger in this case, the only reasonable conclusion of when the occurrence “took place” for the purposes of determining the insurance companies’ coverage obligations is the time of the bodily injuries. Therefore, because the occurrence could have taken place during the period of coverage provided by Utica but not Scottsdale, only Utica would be obligated to indemnify Kahr Arms if the plaintiffs obtain a judgment against the gun manufacturer. See In re San Juan Dupont Plaza Hotel Fire, 989 F.2d 36, 39 (1st Cir. 1993).
CONCLUSION
For the foregoing reasons, the products-completed operations hazard exclusion contained in the Scottsdale and Utica insurance policies does not apply to the plaintiffs’ negligence claims. Utica, therefore, may have a contractual obligation to indemnify Kahr Arms in the event that the plaintiffs obtain a judgment against the gun manufacturer, provided that the jury makes specific findings of fact. With respect to the Scottsdale policy, Kahr Arms is not entitled to indemnity regardless of the resolutions of the underlying lawsuits because the claimed occurrence did not take place within the policy’s coverage territory.
ORDER
Pursuant to Mass.R.Civ.P. 56(c) and G.L.c. 231A, the plaintiffs’ Motion for Summary Judgment is ALLOWED with respect to Utica Mutual Insurance Co. and DENIED with respect to Scottsdale Insurance Co. Accordingly, Scottsdale’s Motion for Summary Judgment is ALLOWED and Utica’s Motion for Summary Judgment is DENIED.
Utica may be obligated to indemnify Kahr Arms, Inc. in any underlying civil action, provided that there is a finding of some fault by Kahr Arms during the operation of Utica’s insurance policy.

Hernandez v. Kahr, Inc. et al., Worcester Superior Court, Civil Action No. 02-1747, and Maisonet v. Kahr et al., Worcester Superior Court, Civil Action No. 02-2025.

Plaintiffs initially brought this action in Superior Court in Aprtl 2005. The insurance companies removed the case to the United States District Court for the District of Massachusetts, on the basis of diversity jurisdiction, and then moved to dismiss. Deciding that prudential considerations weighed against it exercising jurisdiction over plaintiffs’ claims, the District Court denied the motion to dismiss and remanded to the Superior Court. See Hernandez v. Scottsdale Insurance Co., CV 05-40141 (D.Mass. August 3, 2006) (Saylor, J.).

On cross motions for summary judgment in an action brought under G.L.c. 231A, although the allowance and denial of the motions themselves may be viewed as a declaration of rights, the better practice is to expressly declare the rights of the parties. See Dundas Corp. v. Chemical Bank, 400 Mass. 588, 589 (1987). Accordingly, the defendants’ potential liability is set forth in greater detail in the conclusion and order for judgment following this opinion. It should also be noted that even though the court is allowing the plaintiffs’ Motion with respect to Utica, specific questions of fact remain to be resolved before Utica’s indemnity obligations, if any, can be determined. The trial judge must bear these issues in mind when submitting the case to the jury. See G.L.c. 231, §1 (“When a declaration of right, or the granting of further relief based thereon, shall involve the determination of issues of fact triable by a jury . . . such issues may be submitted to a jury in the form of questions, with proper instructions by the court, whether a general verdict be required or not”).

The parties’ pleadings and submissions make inconsistent references to the Kahr gun manufacture as “Kahr Arms, Inc.,” "Kahr Arms,” “Kahr, Inc.,” or simply “Kahr.”The insurance companies have not raised the issue that their insured has been wrongly identified, and therefore the court will not consider it. Henceforward, any reference to “Kahr Arms” or “Kahr” will mean the source facility of the stolen gun components that was insured by defendants.

The same attorneys represent both Hernandez and Maisonet in the underlying tort actions and in this declaratory action.

Plaintiffs amended both actions to include bad faith denial of coverage claims against Scottsdale and Utica.

Both contracts were based on the same ISO (Insurance Services Office) forms.

The Taurus, Beretta, and Bushmaster courts all relied on, and cited extensively to, the Brazos court’s reasoning. See Taurus, 913 So.2d at 538-40; Beretta, 17 Fed.Appx. at 254; Bushmaster, 324 F.Sup.2d at 112-13.

The exclusionary provision applies to “all firearms manufacturing,” and the insurance companies argue that the scope of the exclusion includes gun components. However, that interpretation lacks force when read together with other provisions in the policy, specifically the definition of “product.” A “product,” for the purposes of the exclusion, must be “completed,” “manufactured,” “sold,” or “disposed of’ by Kahr Arms. It is undisputed that the parts were stolen from the Kahr Arms’s facility and assembled at a remote location. In essence, the insurance companies read the exclusion to encompass injuries arising out of any item that originates from a firearms manufacturer’s factory, regardless of its utility or purpose. Such a broad reading would eviscerate the meaning of other provisions in the policy tending to limit the scope of the exclusion. See Shea v. Bay State Gas Co.: Camp Dresser & McKee, Inc., 383 Mass. 218, 222 (1981). In addition, under federal law, a manufacturer must identify each individual firearm with a number engraving before the firearms are eligible to be lawfully distributed. See Gun Control Act of 1968, 18 U.S.C. §923(i). Here, none of the stolen gun components featured a serial number. The court is persuaded by the plaintiffs’ interpretation that the instrumentalities used to inflict injuries and death in this case were not “completed products” at the time they were removed from the Kahr Arms’s facility.